IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BARK, an Oregon non-profit corporation,

        Plaintiff,

    v.

U.S. BUREAU OF LAND MANAGEMENT,
an agency of the United States, and CINDY
ENSTROM, Cascades Resource Area Field Manager,

        Defendants,

FRERES LUMBER COMPANY,

        Defendant-Intervenor.

No. CV 07-1536-MO

OPINION AND ORDER

**MOSMAN, J.**,

Bark, an Oregon non-profit corporation, filed suit against the United States Bureau of

Land Management and Cindy Enstrom, in her official capacity as the Cascades Resource Area

Field Manager, (collectively "BLM"). Bark seeks to prevent the logging of 566 acres in the

Upper Molalla River watershed, known as the Annie's Cabin Timber Sale ("Sale"). Freres

Lumber Company intervened on behalf of defendant BLM.

Bark claims that the BLM's Environmental Assessment ("EA") is arbitrary and capricious

PAGE 1 OPINION AND ORDER

because it violates the procedural requirements of the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 1600, and substantive obligations under the Federal Lands Policy Management Act ("FLPMA"), Northwest Forest Plan ("NWFP"), and Salem Resource Management Plan ("RMP").

Specifically, Bark argues that the EA violates NEPA by failing to properly analyze and disclose the cumulative impacts of the project on water quality, Northern Spotted Owl ("NSO") habitat, invasive species, hardwoods and biodiversity.  Bark further contends the BLM did not disclose, as required under NEPA, the impacts of logging on the Riparian Reserves ("RR").  Additionally, Bark claims the EA violates the FLPMA because it does not comply with the Aquatic Conservation Strategy ("ACS").  Bark asks the court to grant declaratory and injunctive relief setting aside the EA and enjoining the Sale.

Bark's Motion for Summary Judgment (#17) and the BLM's Cross-Motion for Summary Judgment (#34) are currently before the court.  Reviewing the BLM's actions with appropriate deference required by the Administrative Procedures Act ("APA") (5 U.S.C. § 706(2)(A)), I find the agency conducted an adequate cumulative impacts analysis for the purposes of NEPA.  In accordance with NEPA requirements, the BLM disclosed the potential impacts of logging on the RR.  Finally, the EA does not violate the FLPMA as it is consistent with the goals and requirements of the ACS.  Therefore, I GRANT the BLM's Cross-Motion for Summary Judgment (#34) and DENY Bark's Motion For Summary Judgment (#17).

## BACKGROUND

Annie's Cabin Timber Sale entails the commercial thinning of 566 acres of forest within the 129,000 acre Upper Molalla River Watershed.  Roughly one third of the watershed is under

PAGE 2 OPINION AND ORDER

federal management, with the BLM managing 33% of the land and the Forest Service 2%. (Admin. R. Tab 317 at 38-39; *id*. 25 at 158.) The State of Oregon owns 3%. (*Id*.) The remaining 62% belongs to private owners; several major forest industrial landowners own 53% of the watershed. (*Id*.) Thus, "what happens on private lands has a major impact" within the watershed. (*Id*. 52 at 312.)

FLPMA provides the general management direction for federal lands. 43 U.S.C. § 1732(a). The BLM is obligated to manage its public lands in accordance with this multiple use plan. *Id*. ("The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . . ."). Accordingly, the BLM conducted district level planning, resulting in the Salem District RMP. (Admin. R. Tab 319.) Because the Salem District is within NSO range, the BLM must also meet the requirements of the NWFP. (*Id*. 336.) The NWFP is a multi-use plan, based on the principles of conserving and protecting the forest ecosystem while also providing for recreational opportunities and "a predictable and sustainable supply of timber." (*Id*. at 25.)

For management purposes, federal lands are designated according to use. Most lands under federal management are designated as either Wilderness, Late-Successional Reserve ("LSR"), or Connectivity lands, with corresponding restrictions on the types and levels of activities allowed in each area. (*Id*. 317 at 2.) The NWFP further designated land use allocations ("LUA"). (*Id*. 336 at 6-7.) Matrix lands are allocated primarily for timber harvest. (*See id*. at 7.) Riparian reserves are designed to "protect the health of the aquatic system and its dependent species," and thus, are subject to greater activity restrictions under the Aquatic Conservation Strategy ("ACS"). (*Id*. at 7, 9-10.) Of the 566 acres scheduled for harvest in the Annie's Cabin

PAGE 3 OPINION AND ORDER

Sale, 481 acres are located on matrix designated land and 85 acres are in the RR.  (*Id*. 25 at 149.)

To assess the health and condition of the watershed, the BLM and Forest Service conducted the Molalla River Watershed Analysis.  (*Id*. 317 at 2.)  Generally, the watershed was found to be in poor to fair condition, depending on the location within the area.  (*Id*. at 4.) Improvement recommendations included commercial thinning treatments, management activities within the RR to improve stand density and structure, and efforts to reduce the effects of existing roads on water quality.  (*Id*. at 6-8.)

The Annie's Cabin Timber Sale was designed to address some of the problems from past management practices that are causing less than optimal conditions in the watershed.[1]  (*Id*. 282 at 1696; *id*. 317 at 4.)  The thinning project was designed to: (1) help provide a sustainable supply of timber; (2) maintain the health and growth of the developing stands in matrix designated lands; and (3) facilitate the development of late-successional habitat in the RR.  (*Id*. 102 at 870.)

As the BLM developed the plan, it solicited public input.  The agency sent a scoping letter in October 2004 to interested individuals and groups (*id*. 270, 271) and posted notices at the trailheads of the Molalla River Shared Use Trail (*id*. 269).  The BLM held public meetings, received comments, and answered questions related to the project in 2004 and 2005.  (*See, e.g.*, *id*. 124-125, 149-152, 167-220.)

The BLM then prepared and issued an EA and Finding of No Significant Impact ("FONSI") for the Fiscal Year 2006 Timber Sale Thinning projects in July 2005.  (*Id*. 102.)  For the Annie's Cabin Sale, the BLM analyzed three project alternatives:  the Proposed Action, a

---

[1] The BLM proposed four thinning projects, including the Annie's Cabin sale (Admin. R. Tab 102 at 858); the other sales are not challenged in this case.

PAGE 4 OPINION AND ORDER

Helicopter Alternative, and a No-Action Alternative.  (*Id*. at 907-928.)  The EA was released for

public comment on July 20, 2005.  (*Id*. at 858.)  Bark submitted comments on August 19, 2005.

(*Id*. 82.)

 The Final Decision and Decision Rationale ("DR") was signed by Cindy Enstrom on May

30, 2007.  (*Id*. 25.)  For the Annie's Cabin Sale, the DR authorized a mixed-alternative plan to

commercially thin 566 acres of forest, 85 acres of which are located in the RR.  (*Id*. 25 at 149.)

The plan calls for building .6 mile of new road, maintenance of twenty miles of road, and

clearing five acres for road construction and helicopter landing.  (*Id*.)  Additionally, the BLM

adopted a series of design features to reduce or eliminate adverse effects.  (*Id*. 25 at 172-74; *id*.

102 at 873-77.)  In particular, the project added a substantial amount of helicopter yarding (*id*. 25

at 150-51 (176 acres)), and seasonal operating restrictions *(id*. at 174).  The plan further

incorporated measures to reduce physical disturbances on trails and the visual effects of the

management activities, and imposed restrictions on trail use during harvest activities.  (*Id*. 102 at

909.)  The DR also responded to public comments received regarding the EA.  (*Id*. 25 at 181-96.)

 Bark submitted an administrative protest to the DR on June 12, 2007 (*id*. 15), which the

BLM denied (*id*. 4).  Bark subsequently filed the present lawsuit on October 15, 2007.  (Compl.

(#15).)  The BLM has awarded, but not approved, the Annie's Cabin Timber Sale to Freres

Lumber Company.  (*See* Joint Mot. Br. Schedule (#16) 1-2.)

## DISCUSSION

**I.**  <u>**Standard of Review**</u>

 Section 706 of the APA governs judicial review of NEPA and FLPMA.  5 U.S.C. § 706;

*City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004) ("Because the statutes . . . do

PAGE 5 OPINION AND ORDER

not contain separate provisions for judicial review, our review is governed by the APA.").  The

scope of judicial review under section 706 is narrow, and a court must uphold an agency's action

unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. § 706(2)(A).

An agency's decision is arbitrary and capricious "only if the agency relied on factors

Congress did not intend it to consider, 'entirely failed to consider an important aspect of the

problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise.'"  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quoting

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006)).  If the agency

"considered the relevant factors and articulated a rational connection between the facts found and

the choice made," the court must uphold the agency's action.  *Balt. Gas & Elec. Co. v. Natural

Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also City of Sausalito*, 386 F.3d at 1206.

Moreover, the court generally must be "at its most deferential" when reviewing scientific

judgments and technical analyses within the agency's expertise.  *See Balt. Gas & Elec. Co.*, 462

U.S. at 103.  It should not "act as a panel of scientists that instructs the [agency] . . . , chooses

among scientific studies . . . , and orders the agency to explain every possible scientific

uncertainty."  *Lands Council*, 537 F.3d at 988.  The court should also "conduct a 'particularly

deferential review' of an 'agency's predictive judgments about areas that are within the agency's

field of discretion and expertise . . . as long as they are reasonable.'"  *Id.* at 993 (quoting

*Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006))  And "[w]hen specialists express

conflicting views, an agency must have discretion to rely on the reasonable opinions of its own

PAGE 6 OPINION AND ORDER

qualified experts even if, as an original matter, a court might find contrary views more

persuasive." *Id.* at 1000 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

## II.    <u>NEPA Analysis</u>

### A.    *NEPA Statutory Purpose and Requirements*

NEPA requires that federal agencies adequately assess the impact of federal actions

"significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); *Ctr. for*

*Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir.

2008).  NEPA's purpose is twofold: (1) ensure that agencies carefully consider information about

significant environmental impacts and (2) guarantee relevant information is available to the

public.  *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for*

*Biological Diversity*, 538 F.3d at 1185.  This is a procedural requirement imposed on federal

agencies to "take[] a 'hard look' at the potential environmental consequences of the proposed

action."  *Or. Natural Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th Cir. 2006)

(quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir.

2004)).  "Judicial review of agency decision-making under NEPA is limited to the question of

whether the agency took a 'hard look' at the proposed action as required by a strict reading of

NEPA's procedural requirements."  *Bering Strait Citizens for Responsible Dev. v. U.S. Army*

*Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008) (citing *Churchill County v. Norton*, 276 F.3d

1060, 1072 (9th Cir. 2001).

Under NEPA, if the applicable regulations do not categorically require the preparation of

an environmental impact statement ("EIS"), then an agency prepares an EA.  *See Metcalf v.*

*Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).  The EA "[s]hall include brief discussions of the

PAGE 7 OPINION AND ORDER

need for the proposal, of alternatives . . . [and] of the environmental impacts of the proposed

action and alternatives."  40 C.F.R. § 1508.9(b). The purpose of the EA is to provide "sufficient

evidence and analysis for determining whether to prepare an environmental impact statement

[EIS] or a finding of no significant impact [FONSI]."  *Id.* § 1508.9(a)(1).

"If there is a substantial question whether an action 'may have a significant effect' on the

environment, then the agency must prepare an [EIS]."  *Ctr. for Biological Diversity*, 538 F.3d at

1185 (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.

1998)).  The agency must "undertake a thorough environmental analysis before concluding that

no significant environmental impact exists."  *Native Ecosystems Council v. U.S. Forest Serv.*,

428 F.3d 1233, 1239 (9th Cir. 2005) (quoting *Blue Mountains Biodiversity*, 161 F.3d at 1216).

Determining whether an action will have a significant effect on the environment requires

the agency to consider both "context" and "intensity."  40 C.F.R. § 1508.27; *see also Nat'l Parks

& Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001).  One of the factors for

evaluating intensity is cumulative impacts.  The regulation states, in relevant part:  "Whether the

action is related to other actions with individually insignificant but cumulatively significant

impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on

the environment.  Significance cannot be avoided by terming an action temporary or by breaking

it down into small component parts."  40 C.F.R. § 1508.27(b)(7).  A cumulative impact is

defined as:  "the impact on the environment which results from the incremental impact of the

action when added to other past, present, and reasonably foreseeable future actions regardless of

what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative

impacts can result from individually minor but collectively significant actions taking place over a

PAGE 8 OPINION AND ORDER

period of time." *Id*. § 1508.7.

**B.**    ***Cumulative Impacts and Annie's Cabin Timber Sale***

Bark argues that the EA fails to adequately address cumulative impacts from the Annie's Cabin project both on a general level, and specifically as related to water quality, Northern Spotted Owl habitat, invasive species, hardwoods and biodiversity.  I find the EA adequately fulfills the cumulative impact requirement because it provided a reasonably thorough and useful analysis that explains why the project likely will not contribute to cumulative impacts.

**1.    Cumulative Impacts Analysis Requirements**

First, Bark maintains the EA does not provide "detailed information regarding the impacts" of historic timber management in the area or "how this timber sale will further impact forest resources."  (Pl.'s Memo. Supp. Summ. J. (#18) 15.)  Second,  Bark contends that the EA is insufficient, in part, because it does not take into account the incremental impacts of "past, present or foreseeable future projects on the private industrial forest lands that dominate the watershed," or on surrounding BLM lands.  (Pl.'s Memo. Supp. Summ. J. (#18) 15.)

When conducting a cumulative impact analysis, it "must be more than perfunctory; it must provide 'a useful analysis of the cumulative impacts of past, present, and future projects.'" *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999)).  To be useful to decision-makers and the public, the cumulative impact analysis must include "some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005)

(quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998)).

At the outset, it is important to clarify how this court interprets the cumulative impact analysis requirement. Bark argues that this analysis must categorically include the "time, type, place, and scale of past timber harvests, and how different project plans and harvest methods affect the environment." (Pl.'s Reply (#38) 10 (citing *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005); *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007).)

I am unpersuaded by Bark's contention that every EA necessarily requires a cataloguing of all past, present, and foreseeable projects by listing the time, type, place, scale, different plans and methods, without regard to the usefulness of this data. Federal agencies may "aggregate [] cumulative effects analysis" for NEPA purposes. *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1217 (9th Cir. 2008) ("Agencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effects of all past actions combined." (quoting Council on Environmental Quality Memorandum, "Guidance on Consideration of Past Actions in Cumulative Effects Analysis" (June 24, 2005)).

Further, as *Lands Council* recently instructed, "we are not free to impose on the agency our own notion of which procedures are best . . . . Nor may we impose procedural requirements not explicitly enumerated in the pertinent statutes." 537 F.3d at 993 (citations and internal quotation marks omitted). The BLM is not required "to conduct any particular test or to use any particular method, so long as the 'evidence . . . provided to support [its] conclusions, along with

other materials in the record,' ensure that the agency 'made no clear error of judgment that would render its action arbitrary and capricious." *Wilderness Defenders*, 549 F.3d at 1218 (quoting *Lands Council*, 537 F.3d at 993). While the agency is required to determine the cumulative effect of the proposed project combined with other actions, it is neither Bark's nor this court's role to dictate the best procedure for determining those effects. Categorically requiring the agency to discuss in detail every aspect of all previous actions, regardless of their current impact on the area, would impose a requirement not mandated by statute.

In short, it is within the BLM's discretion to determine the way to best analyze cumulative impacts as related to other projects, as long as it gives the environmental impacts the required 'hard look'. Here, the BLM reasonably chose to rely on baseline data, which incorporates historical land uses, for determining the present watershed conditions.[2] (*See, e.g.*, Admin. R. Tab 102 at 911, 882-928; *id*. 317.) As the record demonstrates in the four challenged issue areas below, the BLM adequately evaluated the cumulative impacts of the proposed action.

## 2.    Water Quality

The EA identified three federal projects that—through road work, hauling, thinning and

---

[2] Bark provided supplemental briefing on the implications of the recently decided *League of Wilderness Defenders,* 549 F.3d 1211. Bark argued for the first time that the EA violates NEPA because it is tiered to the Molalla Watershed Analysis. (Pl.'s Resp. Supp. Authority (#66) 3.) I reject this argument for two reasons. First, there is no indication in the record that Bark brought this complaint to the BLM's attention at the administrative level, in its summary judgment briefing, at oral argument, or in the initial court request supplemental briefing. Bark has therefore forfeited the right to now raise objections that it was previously obligated to bring to the agency's attention during the administrative process. *See Public Citizen*, 541 U.S. at 764-65. Second, the EA is not tiered to the Molalla Watershed Analysis. *See Wilderness Defenders*, 549 F.3d at 1219 (reaffirming that federal agencies may not tier to non-NEPA reviewed documents). Rather, the EA refers to the Molalla Watershed Analysis as additional reference material, which is distinguished in context from the documents tiered to the EA. (See Admin. R. Tab 102 at 858, 869.)

PAGE 11 OPINION AND ORDER

yarding in the Riparian Reserves—have the potential to increase sedimentation in the shared streams with the Annie's Cabin project. (Admin. R. Tab 102 at 881.) Bark argues: "[T]he EA lacks any information regarding the size or scope of the [three federal] projects, any discussion of specific impacts of the identified projects or how impacts from the Annie's Cabin Project may cumulatively impact the 'same streams.'" (Pl.'s Memo. Supp. Summ. J. (#18) 17.) Bark further contends that the EA fails to describe the cumulative impacts of the Annie's Cabin project on streams with "significant sediment inputs . . . [from] poorly maintained stream crossings and [blocked] culverts." (Pl.'s Memo. Supp. Summ. J. (#18) 17.) Bark also asserts that the EA does not consider the impacts of this project "when added to the impacts of extensive [private] logging." (Pl.'s Memo. Supp. Summ. J. (#18) 18.)

An agency is required to either provide "some quantified or detailed information" about cumulative effects, or justify "why more definitive information could not be provided." *Ocean Advocates*, 402 F.3d at 868. However, as noted above, this does not automatically translate into a requirement to catalogue actions that are irrelevant, useless, or already incorporated into the analysis. Moreover, when the analysis concludes that the project will have virtually no effect on cumulative impacts, it is unnecessary for the agency to detail other actions. *See Nw. Envtl. Advocates*, 460 F.3d at 1140 ("Because the [EIS] concludes that the . . . project will have virtually no effect . . . detailed cataloguing of past projects' impact . . . would not have 'informed analysis about alternatives presented for the current project,' and was unnecessary." (quoting and distinguishing *Land Councils v. Powell*, 395 F.3d at 1027)).

Here, the BLM reasonably concluded that the Annie's Cabin project would not cumulatively add to existing impacts from other projects, federal or non-federal. The EA

analyzed the effect of the Annie's Cabin project, when combined with the other three federal

projects.  (Admin R. Tab 102 at 881, 890.)  The initial EA assessment concluded that there was a

risk of short-term turbidity from road repair and culvert replacement.  (*Id*. at 890.)

However, the DR for the Annie's Cabin project authorized the mixed-alternative option,

which includes a sixty-foot stream protection zone on perennial streams to "prevent increases in

sediment input to the Molalla River, or increases in stream turbidity or temperature."  (Admin. R.

Tab 25 at 162.)  Within the RR, these buffers will extend from 180 to 360 feet.  (*Id*. 97 at 784.)

The selected plan also provides for substantial helicopter yarding, which "effectively eliminate[s]

all sediment delivery to local streams attributable to these actions in all areas where helicopter

yarding is utilized."  (*Id*. 97 at 789.)  Further, the DR did not authorize live-stream culvert repair

or replacement.  (*Id*. 25 at 162.)  Moreover, the selected alternative does not incorporate road

construction in the RR.  (*Id*.)

The combination of the sixty-foot buffers, helicopter yarding, lack of road building, and

elimination of live stream culvert repair or replacement in the RR is projected to reduce sediment

and turbidity "to levels that are not detectable."  (*Id*. 102 at 913; *id*. 25 at 165.)  The practical

result is that it is unlikely there will be increased sediment from the proposed action; in the event

there is some increase, it will probably be too small to measure or observe.  (*Id*. 97 at 788.)

Thus, the record establishes that there is likely no "direct effect" on the existing conditions that

would cause detectable short-term increases in sedimentation and turbidity.

The BLM also reasonably disclosed and discussed its reasons for finding that there would

likely be no effect on water quality, notwithstanding the worst-case scenario under the Watershed

Erosion Prediction Project ("WEPP") model.  Using the WEPP model, the BLM analyzed the

potential for sediment delivery resulting from thinning and yarding in the RR for all four of the

projects proposed in the EA. (*Id.* 102 at 881.) The agency concluded that effects that were

"theoretically detectable" presented a "worst-case scenario, and likely overestimates the potential

for sediment delivery." (*Id.* at 881 n.2.) The BLM determined that the actual direct effects—for

all four projects—would likely not be detectable because:

> Sediment inputs to streams as a result of yarding would be prevented by excluding
> those activities from the [sixty-foot Stream Protection Zones]. New roads proposed
> for construction would be located on stable locations with no hydrologic connectivity
> and would not contribute to degradation of aquatic habitat. Haul routes are generally
> well-established rocked roads with well-vegetated ditches. Hauling would be
> restricted to dry conditions in order to minimize road generated sediment from
> entering stream channels as a result of hauling.

(*Id.* at 891.) Bark argues that the WEPP has serious limitations when applied to forest lands,

which was not disclosed in the EA. (Pl.'s Reply (#38) 21.) To the extent that Bark contests the

accuracy of the WEPP soil erosion model, the agency is entitled to deference in its area of

expertise. *Lands Council*, 537 F.3d at 993 ("[Courts] are to be most deferential when the agency

is making predictions, within its [area of] special expertise." (internal quotation marks and

citation omitted)).

In short, with no detectable levels of sedimentation and turbidity from riparian thinning,

yarding, and hauling under the adopted plan, there are no direct effects to combine with other

projects. The BLM thus reasonably concluded that the Annie's Cabin project would not add

measurable cumulative impacts to the existing impacts from federal and non-federal projects. As

such, there is no cumulative effect from the project on water quality. Because the BLM

rationally determined that the Annie's Cabin project would not have a measurable effect on

existing water quality conditions, cataloguing would not have informed the current analysis. *See*

PAGE 14 OPINION AND ORDER

*Nw. Envtl. Advocates*, 460 F.3d at 1140.  As such, the agency was not required to discuss the size or scope of other projects where there would not be any additional measurable impact from the proposed project.  For these reasons, I find that the BLM's analysis as to water quality was not arbitrary and capricious.

### 3.    Northern Spotted Owl Habitat

The EA discloses that 137 acres of marginally suitable NSO habitat will be downgraded,[3] and 429 acres of dispersal habitat will be degraded[4] (Admin. R. Tab 102 at 917); these changes will not contribute to cumulative impacts (*id*. at 900).  No suitable habitat within the provincial home range of any known owl pair will be affected by the project.  (*Id*.)

Bark contends: "[T]here is no explanation regarding why these impacts to owl habitat will not combine with other logging on federal and private land throughout the watershed resulting in cumulative impacts."  (Pl.'s Memo. Supp. Summ. J. (# 18) 19.)  Bark further argues that the EA does not include information on the number of acres that will be harvested in the watershed, or past, present, or future projects that have affected or will affect owl habitat.  (Pl.'s Memo. Supp. Summ. J. (# 18) 19.)  Bark also notes that "owl surveys located a northern spotted owl within the project area."  (Pl.'s Reply (#38) at 23 (citing Admin. R. Tab 9 at 46).)

The BLM reasonably determined and explained why downgrading and degrading existing marginally suitable and dispersal habitat, outside the known home range of any owl pair, does

---

[3] "Downgrade habitat means to alter the functionality of spotted owl suitable habitat so that the habitat no longer supports nesting, roosting, and/or foraging behavior, but still functions as dispersal habitat."  (Admin. R. Tab 102 at 977.)

[4] "Degrade habitat means to affect the quality of spotted owl suitable or dispersal habitat without altering the functionality of such habitat.  Such treatments can have long-term benefits to spotted owls by encouraging late-successional characteristics to occur more rapidly."  (*Id*.)

not contribute to cumulative effects.  The NWFP and RMP set the multiple land use allocations for the area where the Annie's Cabin project is located.  Under this framework, matrix designated lands allow commercial timber harvesting and "function as connectivity between Late-Successional Reserves." (Admin. R. Tab 336a at C-39; *id*. at B-1 to B-2.)  Late-successional reserves are designed to "protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth forest related species including the northern spotted owl." (*Id*. at A-4; *id*. 319 at 15.)  Riparian reserves are also "serve as connectivity corridors among Late-Successional Reserves." (*Id*. 336a at B-13.)  In other words, matrix and RR land use allocations serve as owl dispersal habitat, connecting Late-Successional Reserves.

The Annie's Cabin project is located only on matrix and RR lands, which are designated by land use allocation as dispersal habitat. (*Id*. 102 at 975.)  After the thinning project is completed, the area will still retain the necessary characteristics to serve as dispersal habitat. (*Id*. at 917.)  The owl habitat will not be downgraded or degraded below the land use designation of dispersal habitat and thus is within the range anticipated under the NWFP and RMP.  There is no evidence before the court that the BLM acted arbitrarily or capriciously in choosing this scale of measurement to determine that spotted owl habitat would not be substantially affected enough to contribute to cumulative impacts.  As such, the BLM did not act irrationally in concluding that the change to the habitat did not measurably impact spotted owl habitat and thus does not contribute to cumulative impacts.

It was also within the BLM's discretion to limit its analysis of cumulative impacts to the provincial home range of any known owl pair.  Agencies have the discretion to choose the

PAGE 16 OPINION AND ORDER

measurement scope for cumulative impact analysis. *Kleppe v. Sierra Club*, 427 U.S. 390, 414

(1976) ("[I]dentification of the geographic area within which [cumulative environmental

impacts] may occur, is a task assigned to the special competency of the appropriate agencies.");

*see also Wildwest Inst. v. Bull*, 547 F.3d 1162, 1173 (9th Cir. 2008) ("Agencies have discretion to

determine the physical scope used for measuring environmental impacts so long as they do not

act arbitrarily and their choice of analysis scale . . . represent[s] a reasoned decision." (internal

quotation marks and citation omitted)). An agency may appropriately use a species' home range

to define the geographic scope of the cumulative impact analysis under NEPA. *See Selkirk*

*Conservation Alliance v. Forsgren*, 336 F.3d 944, 960 (9th Cir. 2003) (grizzly bears); *Native*

*Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1244 (9th Cir. 2005) (goshawks).

      Here, the BLM analyzed the potential for cumulative effects on the NSO in the context of

the provincial home range of any known owl site. (Admin. R. Tab 102 at 900.) Owl "home

range" is a 1.2 mile circle centered on the nest or activity center. (*Id*. 309 at 69.) There is only

one known spotted owl pair in the area—the "Pine Rock" pair—which is located 1.2 to 6 miles

away from any project units. (*Id*. 99 at 826.) Using the provincial home range, the BLM

measured effects on owls and owl habitat as to the maintenance of suitable and dispersal habitat.

(*Id*. 102 at 900.) The BLM explained in the EA that it chose this scale of measurement because

"a goal for conservation and recovery for northern spotted owl would be to maintain suitable owl

habitat within the provincial home range of known northern spotted owl sites . . . and maintain

dispersal habitat between LSRs and known owl sites." (*Id*. 102 at 900; *see also*, *id*. 309 at 95-

96.) The BLM provided a rational explanation as to why it chose this range.

      Second, the BLM adequately considered other past, present, or foreseeable projects that

could cumulatively affect owl habitat with the proposed action.  The EA describes the vegetative condition of the project area and past management activities.  (*Id*. 102 at 882-83, 911, 966.)  This baseline data serves to aggregate past effects and does not require the agency to detail in a particular procedural fashion the impact of past actions.  Additionally, Bark does not cite any future activities within the NSO provincial home range that would contribute to cumulative impacts.[5]  Thus, there is no evidence to conclude that the BLM acted irrationally in its method of calculating cumulative impacts.

Third, Bark argued in its Reply that a spotted owl was detected the project area.[6]  (Pl.'s Reply (#38) 23 (citing Admin. R. Tab 9 at 46).)  There was some confusion in the subsequent briefing and at oral argument as to when this event occurred and its relative significance for evaluating cumulative impacts.

It appears that there were two separate NSO detection events.  In March 2006, there was a possible NSO reported in Unit 7C of the project area.  (Admin. R. Tab 72 at 559.)  The BLM later determined, through surveys, that there was actually a barred owl present in the unit.  (*Id*. 10 at 47; *id*. 66 at 459-60.)

During 2007, the BLM conducted nine to ten spotted owl surveys in the project area.  (*Id*. 5-10, 31-32, 36-37.)  On the night of June 21, 2007, a BLM owl surveyor heard a single male

---

[5] The EIS for the NWFP and RMP incorporated into its cumulative impact analysis the fact that future harvests of private industrial forest lands are expected to be intensively managed.  (*See* Admin. R. Tab 337 at 3 & 4-7; *id*. 320d at 4-3.)  As such, the estimation of effects from private industrial forest land serves as a constant that has already been factored into the regional evaluation.

[6] Here, Bark cites the record for the June 2007 observation.  Bark referred to the March 2006 possible report of a NSO in its Concise Statement of Material Facts. ((#19) ¶ 5.)

PAGE 18 OPINION AND ORDER

spotted owl.[7]  (*Id.* 9 at 46.)  The BLM surveyor returned the next day to the same location and did

not detect any spotted owls.  (*Id.* 8.)  The BLM followed up with three additional surveys in July

2007 and did not detect any spotted owls on these surveys either.[8]  (*Id.* 5-7.)

Based on the barred owl finding, the BLM satisfactorily explained why it concluded there

was not a spotted owl occupying the area after the March 2006 event.  Indeed, Bark appears to

have dropped this challenge in its supplemental briefing.  (Pl.'s Resp. Def.'s Supplemental Paper

(#60) 3.)

Further, the BLM was not required to incorporate the June 2007 detection into the

project.  The DR was signed on May 30, 2007, prior to the this NSO detection.  As such, the

BLM had rational reason, prior to the detection, on which to base its finding in the EA and DR.

Additionally, as represented by the BLM, this detection occurred outside of the project area.

Four subsequent surveys also did not reveal that a NSO was occupying or nesting in the area;

instead, there were no additional NSO detections in this area.  Under the pre-existing Fish and

Wildlife protocol,[9] this was a sufficient basis for the agency, in the exercise of its expertise, to

conclude that no NSO was occupying or nesting in the area.  While all of this occurred after the

---

[7] The BLM, citing to maps in the record, represents to the court that this detection was not located within the Annie's Cabin project area.  (Def.'s Supplemental Paper (#58) 4 (citing Admin. R. Tab 131).)

[8] In response to the court's request for additional briefing, the BLM submitted extra-record evidence indicating that seven additional surveys in 2008 did not detect the presence of any NSOs.  (Def.'s Supplemental Paper (#58).)  Bark filed a Motion to Strike (#64) most of the BLM's reply, along with the declaration of James S. England.  Because the court does not rely on these submissions in its decision, the motion is DENIED AS MOOT.

[9] For an owl be classified as a resident, either occupying or nesting in an area, the Fish & Wildlife Service Protocol requires a single bird to respond three times within breeding season or multiple times over several years.  (Def.'s Supplemental Paper (#58) Ex. A at 11.)

PAGE 19 OPINION AND ORDER

DR was signed, and thus did not inform the BLM's decision, this evidence is consistent with the administrative record.

For these reasons, there is no basis on which to find that the agency acted in an arbitrary and capricious manner regarding NSO and owl habitat.[10]

### 4.    Invasive Species

#### a.    Waiver

The BLM argues that Bark forfeited the right to challenge the sufficiency of the EA as related to invasive species.  Parties are obligated to alert an agency to their position and contentions.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, *Inc.*, 435 U.S. 519, 553 (1978).  A party forfeits arguments that are not raised during the administrative process. *See Public Citizen*, 541 U.S. at 764-65.  But when making comments the claimant need not  raise the issue using precise legal formulations as long as there is enough clarity that the decision-maker understands the issue.  *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899-900 (9th Cir. 2002).  As such, alerting the agency in general terms will be enough if the agency was given "a chance to bring its expertise to bear to resolve a claim."  *Id*. at 900.

There is some question whether Bark adequately raised the issue of invasive species in its administrative protest.  Initially, Bark addressed its concerns about invasive species during the

---

[10] In its Reply, Bark also asserts a new argument that the EA does not adequately consider the threat of barred owls to northern spotted owls.  (Pl.'s Reply (#38) 23-24.)  The BLM considered the threat of barred owls to spotted owls.  (Admin. R. Tab 25 at 157.)  The agency decided that this threat would not contribute to cumulative impacts based on the decision that the Salem FEIS remained adequate for the purposes of implementing the RMP.  (*Id*. 313.)  In any event, this argument cannot be raised for the first time in a reply brief.  *See Public Citizen*, 541 U.S. at 764-65 ("[Parties] must structure their participation so that it . . . alerts the agency to [their] position and contentions, in order to allow the agency to give the issue meaningful consideration." (quoting *Vermont Yankee*, 435 U.S. at 553)).

PAGE 20 OPINION AND ORDER

EA comment period. (Admin. R. Tab 82 at 647.) The original comment notes the problem, draws attention to the potential for spreading weeds due to project activities, and questions why the spread of noxious weeds is omitted from the cumulative analysis. (*Id*.) The BLM subsequently responded to the invasive weed concerns in the DR. (*Id*. 25 at 187.) Later Bark very generally, and without reference to any of the arguments presented in its Motion for Summary Judgment (#18), raised noxious weed concerns in its administrative protest to the DR. (*Id*. 15 at 128.) Essentially, Bark's administrative protest consisted of noting that "[i]t seems thinning this forest would introduce more . . . invasive species in the forest." (*Id*.)

While the concerns raised in the administrative protest would likely not be sufficient without more, I find that because the BLM had the opportunity to address the issue in the DR— which it did—the agency was sufficiently apprised as to the claims that are now raised before the court.[11] For this reason, I review the substantive challenges to the EA as related to invasive species.

b.    Cumulative Effects

Bark argues that the EA fails to account for the cumulative effects of invasive species because it does not: (1) include site-specific information on the location of the weeds in relation to the project area; (2) explain why management activities will not exacerbate the existing problem in the area; (3) discuss the impacts of permanent road construction and fuel breaks on the spread of noxious weeds; or (4) discuss how project design features will mitigate the impact of noxious weeds. (Pl.'s Memo. Supp. Summ. J. (# 18) 15-16.)

---

[11] While Bark does not raise this argument, it is also likely that the BLM would have been required to address this issue in any event, given the pervasiveness of weeds in the region and in the project area.

PAGE 21 OPINION AND ORDER

"NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a 'hard look' at relevant factors." *Nw. Envtl. Advocates*, 460 F.3d at 1139. As required, the BLM has taken a hard look at the potential impact from noxious weeds and adequately disclosed this information in the EA.

The agency conducted a survey and identified the populations of noxious weeds in the project area. (Admin. R. Tab 222 at 1532-34.) The BLM's botany expert also took detailed field notes of the vegetation, including noxious weeds within the project area.[12] (*Id*. 277.) The EA itself disclosed six invasive species that are well-established. (*Id*. 102 at 882.) The EA also evaluated how weeds could be affected by the project, noting that widespread and well distributed species "could increase in vigor in the short term, as more sunlight reaches the forest floor after treatment." (*Id*. at 885.) Over time, as the canopy closes, weeds that increased from additional sunlight will be shaded out. (*Id*.)

Further, the BLM adequately discussed how design features will mitigate the impact of noxious weeds. Under NEPA, mitigation measures need only need be "developed to a reasonable degree." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000); *see also Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002) (holding that the Corp "was not required to develop a complete mitigation plan detailing the precise nature of the mitigation measures" (internal quotation marks omitted)).

Here, the EA indicated that washing the vehicles before entering the project area would

---

[12] Bark challenges the botanist's report, saying that it was copied and pasted from an earlier assessment. With the exception of a single line, this appears true. However, the botanist's analysis is one of several studies relied on. Further, his report was on the general condition in the area so it could apply to more than one project by the BLM.

PAGE 22 OPINION AND ORDER

reduce the risk of spreading new populations of weeds. (Admin. R. Tab 102 at 875.) Other design features include re-seeding the disturbance areas and helicopter yarding that reduces soil disturbance. (*Id*. at 885.) Moreover, the DR authorized only .6 mile of new road construction, as compared to the original proposal of 1.4 miles. (*Id*. 25 at 162.) As recommended by the BLM's botanist (*id*. 222 at 1534), the roads that are used will be decommissioned, which involves seeding the road beds (*id*. 102 at 875). Additionally, the fuel breaks for the Annie's Cabin project are included thinning unit acreage and do no represent additional acres where weeds could potentially spread. (*Id*. at 873, 908.)

Importantly, Bark is not arguing that the BLM failed to analyze an important component of the problem such that the omission would render its analysis arbitrary or capricious. Its position is that the agency did not conduct a sufficiently detailed study. However, the agency is not required to conduct this level of analysis. Rather, analysis must be sufficient to determine that the agency has taken a 'hard look'. The above analysis conducted by the BLM describes conditions and explains why management activities will not exacerbate, in the long-term, the weeds in the area. It also discusses how the design features will mitigate the impact of noxious weeds. In short, the BLM's analysis has provided sufficiently detailed information to demonstrate that it took a "hard look" at the effects of the project. Thus, I find that the EA adequately discussed and disclosed the potential impact of invasive species.

### 5.    Hardwoods and Biodiversity

Bark argues: "[T]he BLM intends to log much of the remaining pockets of hardwood forest in the project area" and fails to disclose in the EA the cumulative impacts on biodiversity from this logging. (Pl.'s Mem. Supp. Summ. J. (# 18) 20-21.) The record suggests that Bark

overstates the extent to which hardwoods will be harvested.

The project units are mainly composed of Douglas-fir and not hardwood stands. (Admin. R. Tab 52 at 322.) Some hardwoods will be thinned, in accordance with "[m]aintain[ing] the same species mix found in the stand now." (*Id*. at 327, 328.) This means that hardwoods would "generally be left standing where they are uncommon." (*Id*. 102 at 875.) Additionally, the proposed thinning treatment is consistent with the matrix and RR land-use allocations. Conifer production and harvesting is anticipated and allowed under the matrix (and GFMA) designations and the Salem District RMP. (*Id*. 319 at 48.) The proposed thinning treatment with the RR is designed to contribute to aquatic habitat diversity. (*Id*. 102 at 907.)

Moreover, the BLM has adequately disclosed the effects of the project on vegetative conditions. (*Id*. at 883-85.) The agency further determined that conifer regeneration will have the effect of enhancing wildlife and wildlife habitat diversity. (*Id*. at 887, 899-900.) While Bark may disagree with these assessments, it has not cited any contrary evidence that undermines the reasonableness of the agency's determination. To the extent that Bark contests the EA's analysis as to the beneficial effects of conifer restoration, the BLM is owed deference by the court in areas of the agency's expertise, as it provided evidence to support its conclusions and made no clear error of judgment. *See Lands Council*, 537 F.3d at 993.

C.    *EA Disclosure of the Impacts on Riparian Reserve Logging*

_____Annie's Cabin DR authorizes logging eighty-five acres on riparian reserves. (Admin. R. Tab 25 at 149.) Bark contends that the EA analysis supporting this decision is flawed because it does not sufficiently disclose the impacts of logging on the RR. Bark argues: "[T]he EA includes no information on the current condition of the Riparian Reserves in the project areas, fails to

disclose harvest prescriptions that ensure ACS objectives will be met, and fails to analyze the direct impacts of the projects on the Riparian Reserve areas and the fish and wildlife that depend on these areas." (Pl.'s Memo. Supp. Summ. J. (#18) 22.)  These contentions are without merit.

First, the EA adequately summarized the current condition of the RR as related to the project area.  The BLM described the stand history and vegetative condition in all the project areas. (Admin. R. Tab 102 at 882-83, 911, 966.)  The Molalla River Watershed Analysis, which includes detailed historic and baseline condition data within the RR (*id*. 317 at 48-65, 66-165), was also incorporated into the EA (*id*. 102 at 869).  The EA includes baseline information on hydrology and fish, as well as recreation and other resources related to the Molalla River.  (*Id*. 102 at 912, 914.)  Further baseline conditions include: air quality, fire, and fire hazard (*id*. 102 at 901-902); geology and soils (*id*. at 892); wildlife and wildlife habitat (*id*. at 869, 916-17); and spotted owl habitat (*id*. at 975).

Based on this data, it is inaccurate to claim that the EA contains "no information" on conditions within the RR.  To the extent that Bark contests the accuracy, date of the studies, or the BLM's decision to conduct this analysis by looking at the totality of the project area as compared to parsing out the analysis within each land use designation, *Lands Council* instructs this court to defer to the agency's decision. *See Lands Council*, 537 F.3d at 993.  Additionally, Bark does not point to specific, current conditions within the RR that would undermine the rationality of the BLM's analysis.

Second, the EA adequately disclosed the harvest prescriptions as related to the RR.  The EA indicates that within the RR, ten percent of the treatment area will have unthinned patches, 5-15% of the area will have small gaps, and the remaining areas will be thinned to variable residual

PAGE 25 OPINION AND ORDER

tree density.  (Admin. R. Tab 102 at 871.)  The EA also provided silvicultural prescriptions for

the Annie's Cabin project (*id*. at 970), and the number of acres of each unit within the RR (*id*. 52

at 314-17).

Third, the administrative record demonstrates that the BLM evaluated the project impacts

within the RR.  It is entitled to deference in how it organized this analysis.  As described in the

EA and DR, Annie's Cabin entails a limited thinning project on eighty-five acres of Riparian

Reserve.  The EA states: "The selected action incorporates very little road construction (.6 mile,

none within Riparian Reserves) or decommissioning, and no live stream culvert repair or

replacement." (*Id*. 25 at 162.)  The BLM further analyzed the potential effects on wildlife habitat

(*id*. 102 at 897-901) and wildlife (*see, e.g.*, *id*. at 898, 917 (Northern Spotted Owl); *id*. at 898,

917 (Oregon slender salamander; *id*. at 898-99 (Northern goshawk); *id*. at 899-900 (migratory

and resident birds)).  Thinning in the RR is projected to have beneficial impacts on aquatic

habitat (*id*. 102 at 891), "enhance terrestrial habitat complexity in the long and short term" (*id*. at

907), and "result in forest stands that exhibit attributes typically associated with stands of more

advanced age and stand structural development . . . sooner" (*id*. at 994).

In addition to its limited nature and anticipated beneficial effects, the project incorporates

measures to reduce potential negative impacts.  This includes prohibitions against cutting old-

growth trees or harvesting within sixty feet of perennial streams (which maintains riparian

vegetation and stream temperature), and forbids cutting with mechanical harvesters within

seventy-five feet of any stream.  (*Id*. 25 at 152-53; *id*. 52 at 328; *id*. 102 at 874-875.)  As

previously discussed, the mixed-alternative option utilizes helicopter yarding to reduce ground

activities that would potentially increase sediment.  (*Id*. 102 at 914-15.)  No road construction is

authorized within the RR. (*Id*. 25 at 162.)  The BLM further incorporated design features to reduce the potential for mass soil movement.  These include restricting ground-based harvesting under certain moisture conditions (*id*. 102 at 875); limiting ground-based yarding in the RR to slopes under thirty percent (*id*. 25 at 172); prohibiting activity on steep, unstable slopes where the potential for mass movement is high (*id*. 102 at 888); and deciding against a ramp over the slide in section 31 (*id*. 25 at 151).

Further, the BLM's conclusions as related to the potential impacts within the RR are reasonable.  The agency relied on scientific evidence in determining that a "gap strategy," which creates small gaps in the tree canopy, would enhance diversity and late-successional characteristics in the RR.  According to the silviculturist's report, "[t]here is a considerable body of research on thinning Douglas Fir stands." (*Id*. 52 at 324.)  The BLM incorporated a variety of research from specialists. (*See, e.g.*, *id*. 99 at 840-41; *id*. 290 at 2010, 2014; *id*. 297 at 2287-88.)  It also utilized recommendations from the Molalla River Watershed Analysis in developing its strategy. (*Id*. 317 at 193, 195.)  There is no contrary evidence to suggest that the data is flawed or that the BLM otherwise ignored important aspects in developing the plan.  As such, the agency is entitled to deference from this court as to its chosen strategy within its area of expertise. *See Lands Council*, 537 F.3d at 993.

### III.    The ACS and Annie's Cabin Timber Sale

####    A.    *The Aquatic Conservation Strategy*

FLPMA requires the BLM to engage in land-use planning for the public lands it manages. 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . . .").  In 1994, the Secretaries of

Agriculture and Interior adopted the NWFP, a comprehensive plan for managing twenty-four million acres of federal land within range of the NSO in Oregon, Washington, and northern California. (Admin. R. Tab 336 at 1-2, 39.) The NWFP serves two purposes: (1) protect the health of the forest ecosystem; and (2) provide for a sustainable supply of timber and other forest products. (*Id*. at 25-26.)

One component of the NWFP is the ACS. The purpose of the ACS is to "restore and maintain ecological health of watersheds and aquatic ecosystems contained within them on all public lands." (*Id*. 337a, App. B6 at B-81.) The ACS consists of four components: Riparian Reserves, Key Watersheds, Watershed Analysis, and Watershed Restoration. (*Id*. 336a at B-12.) The RR are "portions of watersheds where riparian-dependent resources receive primary emphasis and where special standards and guidelines apply." (*Id*.)

Further, agencies must demonstrate that projects "meet" or do "not prevent[] attainment" of the nine objectives identified in the ACS. (*Id*. 337a, App. B6 at B-81 to B-83.) These nine objectives include:

1. Maintain and restore the distribution, diversity, and complexity of watershed and landscape-scale features.
2. Maintain and restore spatial and temporal connectivity within and between watersheds.
3. Maintain and restore the physical integrity of the aquatic system.
4. Maintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems.
5. Maintain and restore the sediment regime under which aquatic ecosystems evolved.
6. Maintain and restore in-stream flows sufficient to create and sustain riparian, aquatic, and wetland habitats.
7. Maintain and restore the timing, variability, and duration of floodplain inundation.
8. Maintain and restore the species composition and structural diversity of plant communities in riparian areas and wetlands.

PAGE 28 OPINION AND ORDER

9.  Maintain and restore habitat to support well-distributed populations of native plant, invertebrate, and vertebrate riparian-dependent species.

(*Id*. at B-82 to B-83.)

A.    ***Short-Term Compliance with ACS Objectives***

Barks argues that the EA is not in compliance with ACS objectives because it does not account for short-term, localized effects of the thinning project, which consist of increased sediment transport and turbidity from road repair, construction, and hauling and yarding around the riparian reserves.  (Pl.'s Mem. Supp. Summ. J. (#18) 27.)  Rather, Bark asserts, "the EA only discusses the long-term potential outcomes for the watershed."  (Pl.'s Mem. Supp. Summ. J. (#18) 25.)

A plan that does not properly account for short-term, localized effects—in addition to long-term, watershed scale impacts—is arbitrary and capricious.  *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036-37 ("Appropriate analysis of ACS compliance is undertaken at both the watershed and projects levels . . . . [F]ailure [] to evaluate short-term impacts, (i.e. impacts that would manifest in less than a ten-year period) [is] also arbitrary and capricious." (internal quotation marks and citation omitted)).

The EA, as supported by the updated DR and project record, properly evaluated and disclosed short-term,[13] site-specific impacts for the proposed project in accordance with ACS objectives.  The EA summarizes the project's consistency with the four broad ACS components:

_____

[13] The BLM defined short term as 1-2 years, with long term beyond 3-5 years.  (Admin. R. Tab 102 at 890, 886.)  It is notable that both of these time frames are less than the ten year, long-term time frame rejected in *Pacific Coast*.  265 F.3d 1028.  Notwithstanding Bark's reliance on time-frame labels, rather than the substantive importance of the number of years, the BLM did consider, according to its own definition, the potential short-term effects of the project.

PAGE 29 OPINION AND ORDER

RR are designated, the project is not located in a Key Watershed, the watershed analysis was completed, and the project contributes to the NWFP restoration goal of "restoring large conifers in Riparian Reserves." (Admin. R. Tab 102 at 906-07.) The updated DR similarly reflects the projects compliance with these four main components. (*Id*. 25 at 159-60.)

The EA also summarizes the project's consistency with the nine ACS objectives and provides explanations and reasons for the BLM's conclusions. (*Id*. 102 at 994-97.) The EA summaries are supported by the DR and the specialist reports. The Resource Area Manager certified that the project was reviewed against ACS objectives at the "project or site scale" and complied with the ACS on a short-term localized scale. (*Id*. 25 at 159-60.) Further, the record details each of the nine ACS objectives and how the project either immediately impacts the environment, or reasons that the BLM found there would be no significant effect at a short-term, localized scale. (*See, id*. 102 at 875, 883, 886-889, 891, 913; *id*. 25 at 152, 162, 183; *id*. 95 at 702.)

Contrary to Bark's assertion, the BLM reasonably concluded that the project does not violate ACS objectives in the short term as related to sediment and turbidity in streams. As previously discussed, the BLM concluded that the adopted mixed alternative plan would not lead to detectable increases in sediment and turbidity in streams. (*Id*. 25 at 162.) The design features include having sixty-foot protection zones, limiting hauling to dry conditions, and not replacing or repairing live-stream culverts. (*Id*. at 162.)

Even if the BLM had found that the adopted proposal would increase effects in the short-term to detectable levels, it would still not be in violation of the ACS objectives. The NWFP states that "management actions that do not maintain the existing condition or lead to improved

conditions in the <u>long term</u> would not 'meet' the intent of the Aquatic Conservation Strategy and . . . should not be implemented." (*Id*. 336a at B-10 (emphasis added).)  Thus, "evidence . . . that a project will result in some degradation does not, standing alone, constitute ACS noncompliance." *Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 2d 1063, 1070 (W.D. Wa. 1999), *aff'd in part and vacated in part*, 265 F.3d 1028.

In short, the administrative record demonstrates that the BLM evaluated the Annie's Cabin Timber Sale in accordance with ACS objectives.  It conducted this analysis at both the short-term, localized scale and at the longer-term, watershed scale.  As such, there is no evidence to find that the BLM's decision to thin eighty-five acres within the RR was arbitrary or capricious, as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co.*, 462 U.S. at 105.

**B.**     ***Riparian Reserve Logging and ACS Objectives***

Bark argues:  "The EA does not support a finding that logging in Riparian Reserves is necessary to meet ACS objectives.  Rather, the EA and DR would allow actions likely to diminish the area's ability to meet the ACS objectives."  (Pl.'s Mem. Supp. Summ. J. (#18) 27.)

While there are restrictions limiting activities within the RR, the NWFP and RMP permit the BLM to harvest timber in RR areas for the purpose of attaining ACS objectives.  (Admin. R. Tab 336a at C-31 to C-32); *id*. 319 at 11.)  Generally, the ACS standards and guidelines "[p]rohibit timber harvest, including firewood cutting, in Riparian Reserves." (*Id*. 336a at C-31 to C-32.)  However, under one exception this provision, the NWFP allows timber harvest in RR areas to "[a]pply silvicultural practices for [RR] to control stocking, reestablish and manage stands, and acquire desired vegetation characteristics needed to attain Aquatic Conservation

Strategy objectives." (*Id*. C-32.)

The record suggests that the BLM rationally determined that a limited thinning would reasonably accomplish ACS objectives.  The purpose of the thinning is to develop an understory stand to "restore elements of structural diversity in Riparian Reserves." (*Id*. 25 at 160.) Structural diversity is lacking in many areas of the RR because "[m]ost of the federal Riparian Reserves are on BLM land beside the Molalla River corridor.  A large portion of them were acquired by the BLM in a land exchange with private industry to block up federal land along the river.  These lands were all harvested before the exchange, so they are mostly made up of younger age classes." (*Id*. at 159.)

The BLM's decision to manage stands in the RR by thinning was based, in part, on the silviculturist's report.  Under the ACS, "[s]ilvicultural practices are to be applied to control stocking and to reestablish and manage young stands.  Appropriate practices may include thinning densely-stocked stands to encourage development of large conifers and releasing young conifers from overtopping hardwoods." (*Id*. 52 at 312 (citing NWFP, *id*. 336a at B-31).)  The silviculturalist's report recommended thinning because the existing stands "are too dense to facilitate an immediate natural development of a multi-story stand.  Disturbance is needed to start a new tree layer.  The combination of clumps, gaps and standard thinning should average out to RD 40 and still provide the diversity needed to develop a new conifer layer." (*Id*. 52 at 323.)

In short, stand management is permitted under the NWFP and RMP.  The BLM, having acquired formerly private lands that lacked stand diversity, reasonably followed silviculture prescriptions recommending that thinning treatment could restore stand diversity.  This is consistent with ACS objectives.  As such, there is no basis on which to conclude that the BLM

PAGE 32 OPINION AND ORDER

acted in an arbitrary or capricious manner by approving thinning within the RR.

## CONCLUSION

Based on the foregoing, I GRANT defendant's Cross-Motion for Summary Judgment (#34) and DENY plaintiff's Motion for Summary Judgment (#17). I further DENY AS MOOT plaintiff's Motion to Strike (#64).

IT IS SO ORDERED.

DATED this    5th    day of February, 2009.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court
